UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| VICKI WADE, Personal Representative of ) <br> the ESTATE OF BRANDON WADE, deceased, ) <br> ) <br> PLAINTIFF ) <br> v. ) <br> ) <br> KENNETH C. FRIES, in his official capacity as ) <br> Sheriff of Allen County, ) <br> DEFENDANT ) | CASE NO. 1:06-CV-404 JVB |

**OPINION AND ORDER**

Brandon Wade was detained at the Allen County Jail. Before booking was completed, the jail nurse established that Wade was a chronic alcoholic and that he had suffered from delirium tremens in the past.[1] Less than three days into his detention, Wade was found unresponsive in his cell and later pronounced dead at the hospital.

As a result of the death, Plaintiff Vicki Wade, the personal representative of Wade's estate, sued various individuals and the Sheriff of Allen County pursuant to 42 U.S.C. § 1983 and several theories of state law liability. At this time, only the § 1983 claims remain against the Sheriff of Allen County. Both parties filed motions for summary judgment which are the subjects

---

[1] Delirium tremens is a severe form of alcohol withdrawal that involves sudden and severe mental or neurological changes.
. . .
It is most common in people who have a history of alcohol withdrawal. It is especially common in those who drink the equivalent of 4–5 pints of wine or 7–8 pints of beer (or 1 pint of "hard" alcohol) every day for several months. Delirium tremens also commonly affects those who have had a history of habitual alcohol use or alcoholism for more than 10 years.
. . .
Symptoms most commonly occur within 72 hours after the last drink, but may occur up to 7–10 days after the last drink. Symptoms may get worse rapidly
. . .
Delirium tremens is a medical emergency.
(http://www.nlm.nih.gov/medlineplus/ency/article/000766.htm, last visited August 19, 2009).

of this opinion and order. For the reasons stated below, the Court denies both motions.

**A. Summary Judgment Standard**

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Parties opposing a motion for summary judgment must set forth in a "Statement of Genuine Issues . . . all material facts as to which it is contended there exists a genuine issue necessary to be litigated." L.R. 56.1. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). The existence of cross-motions for summary judgment does not necessarily indicate that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, an evaluation of the facts in a light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**B. Material Facts**

The material facts of this case are largely undisputed:

**(1)** *Wade's Confinement at the Allen County Jail*

On June 10, 2005, the Fort Wayne City Police arrested Brandon Wade during a narcotics raid at his home. Wade was taken to the Allen County Jail but was not immediately admitted as he indicated a need to go to the hospital first. Accordingly, Wade was then taken to the emergency room of St. Joseph Hospital. Dr. Jeffrey Yablong examined Wade and determined that he was a chronic alcoholic. However, because Wade showed no signs of alcohol withdrawal, Dr. Yablong cleared him for return to the jail.

Wade's discharge instructions contained the following warnings:

RETURN PROMPTLY or contact your doctor if any of the following occur:
– Severe shakiness or seizures (convulsion)
– Fever over 100.5
– Confusion or hallucinations (seeing, hearing or feeling things that aren't there)
– Increasing upper abdominal pain
– Repeated vomiting or vomiting blood.

(Def.'s Ex. 21.)

Wade was returned to the Allen County Jail where Officer Ray conducted the intake screening. Officer Ray sent the discharge instructions from St. Joseph's Hospital to the jail nurse, as required by the jail policy. Officer Ray noted that Wade smelled of alcohol. Wade told Officer Ray that he had a substance abuse problem.

One of the jail nurses, Beth Thomas, also evaluated Wade, who told her that he was an alcoholic and had suffered from delirium tremens in the past.[2] During Wade's physical exam, Nurse Thomas noted that Wade was showing signs of alcohol withdrawal: he was trembling, shaking, and nauseated. After her assessment, Nurse Thomas contacted St. Joseph's Hospital to

---

[2] Also, at some point later during the day, Wade's brother called Officer Fields to inform the jail that Wade had suffered from delirium tremens in the past.

3

get directions for Wade's care. She was ordered to give Wade Valium to help with the withdrawal systems, Phenergan for nausea and vomiting, Librium for drug and alcohol withdrawals, Thiamine, a vitamin, and a multivitamin.

Following the examination, Nurse Thomas placed Wade on a medical watch requiring the officers to check on him every thirty minutes. She also created a medical sheet so that the officers could note their observations.

The watch began at 8:45 p.m. on June 10. However, the officers did not include all their observations on the medical sheet. For example, on June 11, Officer Ed Hegbli saw Wade picking at the door and phone in his cell. Officer Hegbli thought that Wade was experiencing DTs. (Pl.'s Ex. 9 at 24, 16–21). Yet, Officer Hegbli did not report his observations to anyone.

On June 12, at 2 pm, Officer Eric Templeton saw Wade sweating heavily. Although Officer Templeton knew that sweating was one of the signs of alcohol withdrawal, he did not note this on the medical sheet. He also heard Wade speak incoherently but again made no entry on the sheet. At 5:30 pm, Officer Templeton removed Wade's food tray from the cell. He saw that Wade had not eaten anything. Wade seemed to hallucinate because he asked Officer Templeton to speak to a nonexistent lady who according to Wade was sitting there. (Pl.'s Ex. 10 at 49, 5–15).

At 6:20 pm, Officer Templeton took Wade to a nurse for a scheduled check-up. At that time Wade was still sweating heavily and had to be handcuffed because of his bizarre behavior. (Pl.'s Ex. at 52–53.) Nurse Thomas noted that Wade was sweating profusely and that he smelled of fecal matter. (Pl. Ex. at 76, 1–15.) Officer Templeton was present during the visit but did not tell the nurse anything about his observations.

At 9:00 pm, Officer Templeton and Officer Coburn went to Wade's cell where they

found him naked and hallucinating. Wade told the officers that he had just gotten out of the shower, although there was no shower in the cell. Neither officer noted this behavior on the medical sheet. (Pl.'s Ex. 10 at 55–57.)

At 9:55 pm, Officer Krawczyk and Officer Pruden walked past Wade's cell and saw him sitting in the bathroom stall with only his feet sticking out. The officers entered the cell, at which point Wade stood up and began speaking incoherently. The officers left the cell without taking any action, although Officer Krawczyk recognized that speaking incoherently could be a sign of DTs. (Pl.'s Ex. 11 at 37–38, 40.)

During the entire shift from 2 p.m. until 10 p.m. on June 12, Wade's medical sheet was kept in Central Control instead of being posted outside Wade's cell, which is the usual practice. (Pl.'s Ex. 12 at 22, 3–17.) Officer Angela Keller's notations appear on the medical sheet beginning at 2:19 p.m. and ending at 8:49 p.m. Keller was stationed at the Central Control desk. She remained there the entire time and never walked to Wade's cell to check on him. Although she made entries of "talking" on the medical sheet, she could not be sure if Wade was talking rationally or incoherently. (Pl.'s Ex. 12 at 24, 21–25.) During her shift, Keller saw Wade take off his clothes but made no entry on the medical sheet to reflect this behavior.

Officer Kevin Pribble's notations appear on the medical sheet at 9:12 p.m. and 9:43 p.m. Officer Pribble made his entries from Central Control. He saw Wade naked but did not mark this on the medical sheet. (Pl.s Ex. 14 at 28, 14–22.)

Officer Miller's notations appear on the medical sheet at 10:00 p.m. and 10:30 p.m. Officer Miller saw Wade digging at the window and door, trying to get out of the cell, and behaving erratically. However, Miller did not think his behavior was extraordinary and did not make any specific remarks on the medical sheet.

As night turned to early morning hours of June 13, Wade was moved from his regular cell to a padded one. Officer McIntyre, the shift supervisor, saw that Wade was trying to unscrew the phone and bite the phone cord, and was pacing back and forth. Officer McIntyre recognized Wade's behavior as symptomatic of DTs but did not contact the nurse.

Also in the early hours of June 13, Officer Bonita Brown saw Wade playing in the toilet in his cell. She thought this behavior was normal for someone going through DTs. Brown made no entry on the medical sheet. At 5 a.m., Brown wrote "breathing" on the medical sheet. She did not go inside the cell to observe Wade; she just saw the rise and fall of his chest. Brown did not contact the nurse.

At 6:20 am, Officer William Rau entered the cell to wake Wade up for the day but Wade was unresponsive. Although there was also a puddle of vomit beneath Wade (Pl.'s Ex. 17 at 28–29.), Rau wrote down "snoring" on the medical sheet. Because Wade was unresponsive, Sergeant Reed was called in. Reed tried to rouse Wade but he did not respond. Reed then called the nurse, and Wade was taken to Lutheran Hospital where he later died.

**(2)** *Autopsy*

After Wade's death, Dr. Pramrod Carpenter performed an autopsy and concluded that the cause of death was a massive hypertensive stroke with secondary acute left subdural hemotoma. Dr. Carpenter noted DTs as one of his findings, but could not determine if DTs were a cause of Wade's death.

**(3)** *Other Deaths at Allen County Jail*

Besides Wade, three other persons have died at the Allen County Jail since 1999. Holly

Traeger died on May 25, 1999. Traeger was taken to the jail after being picked up on a warrant at the courthouse where she had appeared for an eviction hearing. The Coroner's report indicates that Traeger died soon after admission to the jail from a multiple drug overdose. (Def.'s Ex 43 at 7.)

Another person who died at the Allen County Jail was Sharon Yoder. She died on September 16, 2000. The postmortem examination showed that the cause of death was a hemorrhage or a heart condition: "severe pulmonary congestion and acute hemorrhage." (Def.'s Ex. 44 at 2.)

Daniel Freeman died on August 15, 2001, while detained at the Allen County Jail. Freeman was sent to the jail after appearing for court intoxicated. He died almost four hours later. The toxicology results indicated that Freeman had a "more than toxic level of Oxycodone, a more than therapeutic level of propoxyphene and Noproxyphene, as well as alprazolam, and lidocaine (given by medics), along with an ethanol level of .346%." (Def.'s Ex. 45 at 3.) The Coroner ruled that the cause of death was "an overdose of prescription medication and ethanol." (*Id.*)

**(4)** *Jail Policies Regarding the Care of Detainees*

In April 1994, the Allen County Sheriff's Department implemented medical policies and procedures consistent with the National Commission on Correctional Health Care Standards. The policies are contained in the Allen County Jail Standard Operating Procedures ("SOP"). The SOP includes several sections pertaining to the provision of medical care for detainees with alcohol problems. For example, according to SOP, the Allen County Sheriff's Department does not accept arrestees with a blood alcohol level content of .25 or higher without prior medical

clearance from a physician. Also, during the screening process, the officers are required to determine if the arrestee has any health care problems, including alcoholism. The SOP also requires that all jail workers be adequately trained to identify persons displaying sings of chemical dependency. Finally, the policies require jailers to continually monitor inmates who experience alcohol withdrawal and to notify the health services staff if symptoms of withdrawal become evident.

All correctional officers at the Allen County Jail complete a forty-hour specialized training program pursuant to Indiana Code § 11-12-4-4 within the first year of employment. Six of these hours are devoted to training and interacting with persons with mental illnesses and addictions, mental retardations, and development disabilities. The new officers are trained by medical personnel regarding alcohol withdrawal consistent with the National Sheriff's Association Jail Officers Training Manual and SOS. They are taught to properly observe the inmates, to recognize symptoms of DTs, and note their observations on the medical sheets.

In addition to the specialized training, new officers receive on-the-job training and are mentored by supervisors and experienced officers. Additionally, all officers are provided with ongoing in-service and remedial training to maintain adequate knowledge and skills to discharge their duties.

**(C) Discussion**

Plaintiff concedes in her Response to the Defendant's Motion for Summary Judgment that the only remaining claim in this case is the claim against the Sheriff of Allen County, Kenneth Fries, in his official capacity. The Defendant in turn concedes that there is a genuine issue of material fact as to whether the individual officers of the Allen Country Jail violated

8

Wade's civil rights protected by the Eleventh Amendment to the United States Constitution.[3] However, Defendant argues that there is no evidence that it maintained policies or customs that caused Wade's death, thus necessitating summary judgment in its favor.

The Plaintiff claims two theories of municipal liability: First, she maintains that there was a widespread practice among the Allen County Jail officers of exhibiting indifference to detainees at risk for medical problems arising from alcohol abuse. The Plaintiff insists that this is evident from the fact that more than a dozen officers failed to note Wade's condition on the medical sheet let alone report it to the jail medical staff. Second, she argues that the Sheriff was deliberately indifferent to the need for training his officers in how to adequately monitor detainees at risk for medical problems arising from alcohol abuse.

**(1)** *Section 1983 Standard*

Section 1983 is not a source of substantive rights. Instead, it provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd.*, 526 U.S. 687, 749 n.9 (1999). To prevail on a claim under § 1983, a plaintiff must show that "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *J.H. Exrel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003) (citing *Reed v. City of Chi.*, 77 F.3d 1049, 1051 (7th Cir. 1996)).

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . .

---

[3]The Eight Amendment Protections are applicable to pretrial detainees through the Due Process Clause of the Fourteenth Amendment.

inflicts the injury that the government is responsible under § 1983." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1979). The common law principle of *respondeat superior* will not establish municipal liability in a § 1983 case. *Id*. at 692–694. Rather, a municipality will only be held liable when its official policy or practice *causes* a constitutional violation. *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994). That is, a plaintiff must show that

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006).

> To prove causation under the failure to train theory, Plaintiff
> 
> must demonstrate that this omission evidences "'a deliberate choice to follow a course of action ... from among various alternatives' by city policymakers." In keeping with this, the Court in *Canton* stated the rule that claims of municipal liability under § 1983 based on inadequate training "can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Canton*, 489 U.S. at 392.

*Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994).

What this means in the present context is that before the Defendant can be said to be deliberately indifferent to the constitutional rights of persons suffering from DTs, Plaintiff has to show that the Defendant was on notice of a pattern of constitutional violations resulting from the inadequate training of jail personnel in recognizing the symptoms of DTs. This notice of violations would have to show that the failure to provide further training was tantamount to a deliberate or conscious decision on the part of the defendants to allow the violations. *See id*.

**(2)** *Analysis*

In light of the record before the Court, the cross motions for summary judgment must be denied. "The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting the misconduct of subordinate officers." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995). "When this method of proof is used, proof of a single act of misconduct will not suffice; for it is the series that lays the premise of the system of inference." *Id*.

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006), is one case where the Court of Appeals for the Seventh Circuit applied the principle that a series of instances of misconduct must be present before municipal liability can be found. In that case, the Court found that a prison's failure to provide methadone to a qualified inmate for a period of five days, where evidence abounded that such long delays were routine, established a widespread practice within the prison of violating the inmates' constitutional rights, even though the plaintiff could not show that anyone had been injured in the past as a result of the delays. *Davis* did not set a bright line for when a widespread practice can be deemed to have taken place; instead it provided a principle which, when applied in this case, requires denial of the cross motions for summary judgment.

In the instant case, the Allen County Jail had a policy for dealing with detainees at risk of DTs. The policy required that the jail officers note an inmate's condition on a medical sheet at intervals established by the jail nurse or report their observations to the nurse directly. Unfortunately, more than a dozen officers—one and all—over a period of three days, failed to execute this policy, giving a rise to an inference that there was a widespread practice at the Allen

11

County Jail of ignoring the written policy and that the Defendant must have been on notice of a pattern of constitutional violations resulting from the inadequate training of jail personnel in communicating the symptoms of DTs to the jail medical staff. This inference is further supported by the fact that, after receiving the initial training, none of the officers took refresher courses to maintain their professionalism. Finally, Officer Bonita Brown's deposition testimony suggests that Wade's case may have not been the only one, even if no other deaths or serious injuries resulted:

> Q. Let's use the same scenario I just described to you. Should a nurse be told about the symptoms[,] though[,] if they do develop?
> A. That's not something we usually did, was tell them that it's progressing or they may be acting more erratic now than were an hour ago, no, that's not what we did. No, I've never done that.

(Bonita Brown Dep. at 24, 3–9.)

Accordingly, even though the Plaintiff has not presented evidence of other cases where jail officers failed to make appropriate notes on a medical sheet or notify a nurse about the behavior of detainees placed on the DTs watch, the extent of the failure in Wade's case, requires a denial of summary judgment for the Defendants.

However, the lack of evidence of previous incidents involving inmates on DTs watch weakens the Plaintiff's case. When all the evidence is in, the Defendant's argument that Wade's treatment was an isolated incident at the jail may carry the day with the jury. But motions for summary judgment do not get granted just because the opponent's theory of the case has holes; and in this case, it will be the jury's task to assess the size of those holes, if any.

In closing, the Court notes that Plaintiff argued that the deaths of three other inmates at the jail starting in 1999 also establish a pattern of a widespread practice at the jail to disregard jail policies regarding inmates affected by DTs. However, Plaintiff's argument fails to recognize

the dissimilar nature of the causes of death: in the three earlier cases the detainees died of a drug overdose in which alcohol may have played some role; in the instant case, Plaintiff alleges that Wade died of alcohol withdrawal, the opposite of an overdose. Moreover, Plaintiff has not shown that the three deaths involved the same pattern of officers failing to record or report the inmates' symptoms. Therefore, the three deaths cannot be likened to Wade's death and are irrelevant on considering the extent of civil rights violations at the jail.

**D. Conclusion**

For these reasons, the Court denies Plaintiff's motion for partial summary judgment (DE 47) and denies Defendant's motion for summary judgment (DE 51). Also, because the Court, in reaching its judgment, does not consider evidence that is prohibited by Federal Rules of Evidence, the Court also denies Defendant's Motion to Strike (DE 61) as moot.

SO ORDERED on August 21, 2009.

   S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE